557 F.2d 373
 FREDERICK L., a minor by his mother, Delores L., on behalf
of himself and all
others similarly situated, Delaware Valley Association for
Children with Learning Disabilities (Intervening
pltf. in D. C.),
v.
Arthur THOMAS, Individually and in his capacity as President
of the Board of Education of Philadelphia, Mrs. Edward
Oberholtzer, William Ross, Robert M. Sebastian, Augustus
Baxter, Mrs. Lawrence Bonnin, Philip Davidoff, George Hutt,
and Alec Washco, Jr., Individually and in their capacities
as members of the Board of Education of Philadelphia,
Matthew Costanzo, Individually and in his capacity as
Superintendent of Schools of the School District of
Philadelphia, Althea L. Cousins, Individually and in her
capacity as Director of Pupil Personnel and Counseling of
the School District of Philadelphia, Marechal-Neil E. Young,
Individually and in her capacity as Associate Superintendent
for Special Education of the School District of
Philadelphia, and the School District of Philadelphia,
The Commonwealth of Pennsylvania ex rel. Israel Packel, and
John C. Pittenger(Applicants for Intervention in D.C.),
School District of Philadelphia, Arthur Thomas, Mrs. Edward
Oberholtzer, William Ross, Robert M. Sebastian, Augustus
Baxter, Mrs. Lawrence Boonin, Philip Davidoff, George Hutt,
and Alec Washco, Jr., Matthew Costanzo, Althea L. Cousins,
Marechal-Neil E. Young, Appellants.
 No. 76-2385.
 United States Court of Appeals,
Third Circuit.
 Argued March 29, 1977.
Decided June 17, 1977.
 
 Robert T. Lear, Philadelphia, Pa., Asst. Counsel, School District of Philadelphia, John M. Elliott, Lawrence D. Berger, Dilworth, Paxson, Kalish & Levy, Philadelphia, Pa., for appellants.
 David Kraut, Stephen F. Gold, Community Legal Services, Inc., Philadelphia, Pa., for appellees Frederick L., et al.
 Janet F. Stotland, Steven Goldberg, Philadelphia, Pa., for Delaware Valley Association for Children with Learning Disabilities.
 Maria Parisi Vickers, Asst. Atty. Gen., Michael von Moschzisker, Deputy Atty. Gen., Eastern Regional Director, Robert P. Kane, Atty. Gen., Philadelphia, Pa., for appellees The Commonwealth of Pennsylvania ex rel. Israel Packel and John C. Pittenger.
 Before ADAMS, ROSENN and WEIS, Circuit Judges.
 OPINION OF THE COURT
 ADAMS, Circuit Judge.
 
 
 1
 In recent years, increasing attention has been focused upon the educational needs of learning disabled children.[1] The lawsuit which has given rise to the present appeal is reflective of this trend. Filed in 1974, the complaint alleges that, in violation of Pennsylvania statutes and the United States Constitution, the School District of Philadelphia (the District) does not provide learning disabled students in its system with a minimally appropriate education.
 
 
 2
 After certifying the suit as a class action, the trial court declined to abstain, determined that the District had failed to meet its obligations under state law and decided that in order for the District to fulfill its responsibilities it would have to identify all learning disabled students in its educational system.
 
 I. THE BACKGROUND
 A.
 
 3
 Since Judge Newcomer's opinion on the merits[2] lucidly sets forth the intricate backdrop for this litigation, we find it necessary to provide only a capsule review of the most salient facts.
 
 
 4
 Knowledge of the etiology and nature of specific learning disabilities is still in an embryonic state.[3] Thus, it is not surprising that there are many differences of opinion among experts in the field, and that whatever consensus does exist is on a relatively high plane of generality.
 
 
 5
 Authorities appear to agree that learning disabilities constitute disorders in basic psychological processes that inhibit victims from understanding, assimilating, interpreting or retaining language and other concepts in a normal manner. Though learning disabled students often have the basic capability for normal intelligence, their disabilities ordinarily prevent them from benefiting from regular instruction and from achieving their true potential. As a result, learning disabled students frequently experience substantial frustration, and such reaction is manifested in emotional disturbances and socially disruptive conduct.[4]
 
 
 6
 While the exact causes of learning disabilities have not, as of yet, been pinpointed, medical testing has led experts to believe that brain injury, either at birth or during early childhood, is a major factor. Also, there is data indicating that the nationwide incidence of learning disability is between one and three per cent of the population.[5]
 
 
 7
 It appears that experts agree that with the provision of special remedial services, learning disabled students can have a beneficial educational experience. The programs that are necessary to achieve this end depend on the severity of a pupil's disability. Those with the most serious disorders will need separate classes or other forms of special attention. On the other hand, students with less drastic problems can benefit from instruction in regular classrooms so long as supplemental supportive services are available. This latter approach is generally referred to as "mainstreaming."
 
 
 8
 Instruments for identifying learning disabled students are still in a developmental stage;[6] at this time the basic tools for the task are the administration of standardized achievement tests and subsequent psychological examinations. However, there is little uniformity in the process of selecting those pupils who possibly are learning disabled and should be analyzed by psychologists. Under some programs, tests are administered to an entire school population, and those in the lowest percentiles are then examined by psychologists who ascertain whether they suffer from learning disabilities. Other methods rely upon teacher or parent referrals of particular pupils to school psychologists for ultimate identification of learning disabled students.
 
 B.
 
 9
 It has been estimated that three per cent of the students in the District approximately 8000 children suffer from specific learning disabilities.[7] Nonetheless, the record discloses that only 1300 learning disabled students in the District have been identified. The District does not test-screen all pupils in order to identify those who are learning disabled. Rather, it places primary reliance upon teacher referrals to psychologists. Judge Newcomer found, however, that, for a number of reasons, the referral method is not an adequate way for identifying pupils suffering from learning disabilities.[8]
 
 
 10
 At the present time, the District furnishes several varieties of remedial education for learning disabled students. First, certain special educational services are available to those learning disabled students who, pursuant to Pennsylvania statutes, have been identified as "exceptional."[9] Such services include full and part-time separate instruction for learning disabled students.[10] None of these types of special education, the Board has admitted, are provided to pupils in the seventh grade and above. And only relatively few students in the fifth and sixth grades receive these services.[11]
 
 
 11
 The District also offers a number of general remedial services to "under-achievers,"[12] but such services are not specifically directed towards learning disabled students. Indeed, a student does not have to be identified as learning disabled or "exceptional" in order to be eligible for these programs. Moreover, since 40 per cent of the students in the system about 105,000 children are considered to be underachievers, it is far from clear whether the unidentified learning disabled students who are not in special education programs are receiving general remedial services.
 
 
 12
 Some efforts have been made by the District to increase the scope of available remedial programs. Then, in 1975, the District submitted a plan to the Pennsylvania Department of Education that would have provided special education for all learning disabled students in the system.[13] A "Special Education Needs Budget" detailing the appropriations required to implement the expanded services that the plan suggested was presented simultaneously. While the Pennsylvania Department of Education approved the special education plan, the Department did not provide sufficient funds to support the proposal.[14] The plan was thus not implemented by the District, and the services available to the learning disabled have not been expanded.
 
 C.
 
 13
 The problem of learning disabled children has been addressed by the Commonwealth through both statutes and regulations. Pennsylvania's Public School Code makes special provision for the education of "exceptional children."[15] "Exceptional children" are those "children of school age who deviate from the average in physical, mental, emotional or social characteristics to such an extent that they require special educational facilities or services."[16]
 
 
 14
 A series of duties are imposed on various governmental entities by the Code. Local school authorities must "report . . . every exceptional child" within the district.[17] The Commonwealth is required to promulgate "standards and regulations for the proper education and training of all exceptional children."[18] School districts must submit plans for the "proper education" of exceptional children for state approval.[19] And the local districts must "provide and maintain . . . special classes or schools in accordance with the approved plan."[20]
 
 
 15
 In 1975, the Commonwealth issued regulations to effectuate this statutory framework.[21] These regulations employ the statutory definition of "exceptional children."[22] The term "exceptional children" is then divided into three subcomponents one of which is "handicapped school-aged persons."[23] And the latter category is defined as including "physically handicapped persons who are . . . learning disabled."[24] The regulations reiterate the obligation of local school districts to prepare plans which provide for the education of exceptional children.[25] They go on to state that "all handicapped and school-aged persons identified shall be provided with an appropriate program of education or training."[26] Finally, the regulations declare that "if a handicapped school-aged person has been reevaluated and is found no longer to have the exceptional characteristics that require special education programs and services," the local district may return him to the regular educational setting.[27]
 
 II. THE PROCEEDINGS BELOW
 
 16
 This suit was filed in January, 1974, and was certified as a class action in May of that year. The class is composed of "all children attending public schools within the City of Philadelphia who have 'specific learning disabilities' and who are deprived of an education appropriate to their specialized needs." In July of 1974, the trial court granted a motion by the Commonwealth to intervene as a defendant.[28]
 
 
 17
 After extensive discovery had been conducted, trial was scheduled for September, 1975. On September 15, 1975, a week and one-half before the trial was due to commence, the Commonwealth filed a motion requesting that the district court dismiss the action or in the alternative to postpone an adjudication of the controversy pursuant to the abstention doctrine.[29] Judge Newcomer took the motion under advisement and trial proceeded.
 
 
 18
 In January, 1976, Judge Newcomer denied the Commonwealth's motions.[30] He determined that the constitutional claims asserted by the plaintiffs were not so frivolous as to warrant dismissal and that state law was not sufficiently unclear so as to mandate abstention.[31]
 
 
 19
 The district court rendered its decision on August 2, 1976.[32] In his opinion, Judge Newcomer did not confront the constitutional claims, since he ruled that the plaintiff class was entitled to relief on its state-law theory.[33]
 
 
 20
 There were several components to the state law holding. First, Judge Newcomer determined that, under Pennsylvania law, learning disabled children are entitled to an "appropriate" or "proper" education. He then ruled that the District had not met this responsibility,[34] and concluded that the District was under an obligation to identify all learning disabled students.[35]
 
 
 21
 The opinion of the trial court did not provide for immediate relief; instead, after further proceedings were held, Judge Newcomer issued Remedial Order Number 1 on August 13, 1976. This directive is only the first step in the process of crafting a remedy. It provides that a master be appointed to oversee and monitor the implementation of the court-ordered relief. The District was commanded to submit a plan to the Master by October 15, 1976, ". . . which is reasonably calculated to identify all of its learning disabled pupils." This identification arrangement was to be put into effect immediately after its final approval.
 
 
 22
 Judge Newcomer's order also mandated the eventual submission of interim and final plans for "the appropriate placement of all students identified as learning disabled." In addition, it directed that the final plan go into effect by the beginning of the 1978-79 school year.
 
 
 23
 Under the Remedial Order the Master has the authority to approve or disapprove any plan submitted by the District. Finally, any unresolved disputes pertaining to the implementation of the court's order or the District's plans is to be submitted to the court.[36] The District has noticed an appeal from the entry of Remedial Order Number 1.
 
 
 24
 After careful consideration of all the contentions raised by the parties, we have concluded that (a) appellate jurisdiction is present; (b) the district court did not abuse its discretion by declining to abstain; and (c) the order requiring the District to submit a plan for identifying all learning disabled students in the system should be affirmed.
 
 III. APPELLATE JURISDICTION
 
 25
 The only jurisdictional basis that has been urged upon the Court is28 U.S.C. § 1292(a)(1), which confers upon the courts of appeals the power to review "interlocutory orders of the District Courts . . . granting . . . injunctions . . .." But it has been argued by the plaintiffs that Remedial Order Number 1 cannot properly be classified as an injunction, and that it therefore is not an appealable order.
 
 
 26
 Plaintiffs concede that the order before us resembles, on its face, a mandatory injunction since it requires the District to submit and ultimately implement a program for identification of learning disabled students, as well as to present and eventually put into force plans for the proper education of these pupils. Nonetheless, they maintain that the order lacks the element of irreparable harm to the losing party that characterizes appealable injunctive decrees. This is so, they reason, since the only action that is immediately required is the submission of plans particularly the identification plan. And before any arrangement would go into effect it would have to be approved by the district court. In sum plaintiffs maintain that only after the trial judge has approved the specific plans will an appeal be timely.
 
 
 27
 The principal buttress of the plaintiffs' argument is the opinion of the Second Circuit in Taylor v. Board of Education,[37] one of the leading cases in this specialized jurisdictional field. In Taylor, a school board attempted to appeal from a judgment issued in January, 1961, which found certain schools to be unconstitutionally segregated.[38] The district court, however, had not made an immediate determination of the remedy that would be necessary to rectify the constitutional violation. Instead, it directed the board to submit "a plan for desegregation in accordance with this Opinion, said desegregation to begin no later than the start of the 1961-62 school year."[39]
 
 
 28
 In an opinion by Judge Friendly, the Second Circuit dismissed the appeal, stating that it had "no power to entertain the Board's appeal until the District Court has finished its work by directing the Board to take or refrain from action."[40] The court rejected the argument that the directive to the Board to submit a desegregation plan was an appealable injunction. Such an "order," the court posited, was merely the equivalent of scheduling a post-judgment hearing on remedy, an action which no one would contend is an appealable order.[41] Moreover, the court reasoned, delaying an appeal until a specific desegregation plan was adopted was consonant with the federal policy against piecemeal appeals. This was so, it claimed, since deferring review until such time would enable the appellate tribunal to examine the case in the context of a specific remedial regime instead of in a mere abstract posture.[42]
 
 
 29
 The District has responded to the plaintiffs' contention by urging that the situation before us is distinguishable from the one which confronted the Taylor Court. It notes, in particular, that the Second Circuit interpreted the order in Taylor as a mere request to submit a plan, whereas Judge Newcomer's decree can be interpreted only as an unequivocal command to produce a plan. Indeed, the District asserts that Judge Newcomer's remedial order should be construed as mandating identification of learning disabled students, while simultaneously deferring implementation of the order. Finally, the District contends that the specifics of the identification plan that is ultimately adopted will add nothing to this Court's perception of the issues, since the District has maintained from the beginning that it is not required to identify all learning disabled students.
 
 
 30
 In support of its position, the District has cited Board of Public Instruction v. Braxton,[43] the second major opinion pertinent to our inquiry. Braxton, like Taylor, was an appeal arising out of a district court judgment that a school system was unconstitutionally segregated. In Braxton, the district court required the cessation of certain practices and the adoption of remedial measures. Implementation of the order was postponed, however, until the school board submitted a plan to comply with these standards.[44]
 
 
 31
 Writing for the Fifth Circuit,[45] Judge Tuttle determined that this was an appealable order. He noted that Taylor was a precedent which was facially inconsistent with such result. Yet closer examination of that opinion led Judge Tuttle to the conclusion that Taylor was distinguishable from the case before him. He remarked, in particular, that Judge Friendly had interpreted the "order" in Taylor as actually being a request for a plan. The decree of the Braxton district court, in contrast, "positively and affirmatively directed that a plan be submitted that would provide for carrying out the paragraphs (of the decree) that were to be later effectuated."[46] Because the plan to be submitted had to deal expressly with specific prohibited acts, the order mandating its submission would be considered an appealable mandatory injunction.[47]
 
 
 32
 We recognize that decisions regarding appellate jurisdiction are of great significance to the smooth functioning of our judicial system, and that the importance of underlying substantive issues should in no way alter our determination as to appealability.[48] However, we have concluded, especially in light of the peculiar facts of this case, that we are presented with an appealable order.
 
 
 33
 Taylor, in our view, is not at odds with our decision. Unlike the situation in that case, delaying the day for appellate review here will not clarify the questions on appeal. In Taylor the exact desegregation plans offered by the school board and ultimately to be adopted by the school district had the potential to alter in a material manner the issues that would be presented to the court of appeals. The determination that desegregation was necessary and that a remedial plan must be submitted provided only a skeletal outline for later adjudication.
 
 
 34
 The precise ingredients of the plan for identification of learning disabled students will have no such metamorphosizing effect on our understanding of this case. Judge Newcomer has clearly ordered that all learning disabled children be identified. Identification, unlike desegregation, knows no degrees. The precise plan ultimately adopted will determine how identification is accomplished, but the nature of the plan cannot affect the extent to which identification is done. Because deferring review will not alter the appellate perspective, it would appear to us that the present appeal is not premature.[49]
 
 
 35
 Moreover, we believe that postponing appellate review in this case would subject the District to serious harm. This is so since compliance with Judge Newcomer's order regarding the identification plan will require it to become enmeshed in a remedial regime which the District asserts it should not be caught up in. Much time and effort will be needed to devise an identification program, and an immediate decision might obviate the need for such activity. We thus hold that Remedial Order Number 1, insofar as it requires the School District to submit a plan to identify all learning disabled students, is an injunctive order appealable under 28 U.S.C. § 1292(a)(1).
 
 IV. ABSTENTION
 
 36
 The defendants maintain, on appeal, that the facts of this case are such that Judge Newcomer was required to have abstained from rendering a decision in order to permit the state courts to pass upon the state law issues contained in plaintiffs' complaint. We are unable to accept this proposition.
 
 
 37
 In a line of cases beginning with Railroad Commission of Texas v. Pullman Co.,[50] the Supreme Court has indicated that, despite the seemingly categorical language of federal jurisdictional statutes, federal courts have equitable discretion to abstain from a decision in certain limited circumstances. According to these cases, abstention is proper when a federal constitutional claim is premised on an unsettled question of state law and where a state court decision on the state law issue might avoid or modify the constitutional problem. Federal court abstention can serve two important interests: unnecessary constitutional adjudication may be avoided and unwarranted federal interference with legitimate and sensitive state programs may be averted.[51]
 
 
 38
 Invocation of the Pullman doctrine, the cases have also recognized, often entails serious burdens.[52] Not only are long delays in the resolution of litigation common, but federal rights might be lost in the interim as well. In addition, the cost of litigation is greatly increased by abstention procedures. Not surprisingly, the Supreme Court has repeatedly admonished the federal courts that an abstention decision should be made only when supported by "special circumstances."[53] It should also be recognized that this Court has emphasized the discretionary nature of the abstention doctrine.[54] Accordingly, we can set aside a district court's determination only if we conclude that there has been an abuse of discretion. With these principles in mind, we turn to the factual configuration presented in this appeal.
 
 
 39
 The District and the Commonwealth assert that the present case contains all of the elements that are prerequisite to abstention. A difficult federal constitutional question whether all students are entitled to a minimally appropriate education has been posed. But the litigation also involves a state law issue, and the resolution of such issue possibly could avoid the necessity of a decision on the federal constitutional question. This is so, the defendants urge, since a determination that state law directs that the plaintiffs be provided with an adequate education and that the District has defaulted upon its obligations would obviate the constitutional problem.
 
 
 40
 Moreover, the defendants claim that the relevant state law is unclear on its face. They assert that there is a dispute over precisely which students the District is required to identify in order to be in conformity with state law. Judge Newcomer accepted plaintiffs' claim that all learning disabled children must be identified, whereas the defendants maintain that only those learning disabled pupils who are "exceptional" need be identified. And they insist that while the statutes and regulations unambiguously provide that "exceptional children" must receive a "proper" or "appropriate" education, it is not at all clear what constitutes such an education.
 
 
 41
 The defendants thus submit that Judge Newcomer should have abstained in order to give the state courts an opportunity to resolve these difficult state law issues. This path, according to them, would have been particularly suitable for two reasons: first, there are no state court decisions interpreting the statutes and regulations; and second, because these enactments are of state-wide applicability, an erroneous interpretation would have serious ramifications on educational programs throughout the Commonwealth.
 
 
 42
 To fortify this argument, the defendants have called our attention to Reid v. Board of Education,[55] a case factually similar to the one at bar. In Reid, a class of brain-injured children brought suit against the Board of Education of the City of New York, charging that the Board had failed to screen and place them in special educational programs, allegedly in violation of the fourteenth amendment. The district court decided to abstain, since the plaintiffs' averments appeared to state a cause of action under state law and because it found substantial ambiguities in the relevant state enactments.
 
 
 43
 Abstention was appropriate in that case, the Second Circuit agreed, noting that the New York provisions that were involved were "sensitive and complex" and not clear.[56] The court also remarked that a decision of the state law issues would embroil the district court in the complex task of overseeing local special educational programs.[57] Additionally, the Court of Appeals pointed out that state court actions "which may bear heavily on the state claims available" to the plaintiffs were then pending.[58] Although this is not a dispositive element in an abstention inquiry, the court continued, it did mean that there was "greater reason to abstain."[59]
 
 
 44
 At the outset of our abstention analysis, we must take cognizance of the fact that the litigation at hand does not present an "orthodox" abstention situation. In a recent decision, the Supreme Court described Pullman cases as those where "a federal constitutional claim is premised" on an unclear state law issue.[60] The constitutional issue in the instant case is not, in the strict sense, "premised" upon a state law question. This is so since the alleged constitutional defects in the District's educational programs will exist, theoretically, regardless of the interpretation placed upon the state statutes or regulations.
 
 
 45
 Nonetheless, we believe that the facts of this case place it within the general ambit of Pullman. The constitutional issue is accompanied by a pendent state law claim. And even though the two problems are not inextricably intertwined, resolution of the state law claim might make it unnecessary to confront the federal constitutional question. Further, an incorrect interpretation of state law might arguably interfere with important state policies.
 
 
 46
 In considering whether the trial court should have abstained, we must assess the level of clarity of the state materials. This is a difficult task since, as commentators have noted, the Supreme Court has not fully illuminated the question of the degree of ambiguity that makes abstention appropriate.[61] Nevertheless, after carefully reviewing the language of the statutes and regulations, we are unable to conclude that they are so unclear that Judge Newcomer was required to stay his hand in favor of the state courts.
 
 
 47
 Although they are not completely free from ambiguity, the statutes and regulations appear to us to establish a fairly straight-forward educational scheme: local school districts must provide those students who, for a variety of internal or environmental reasons, cannot benefit from an ordinary educational regimen with remedial educational services designed to help them overcome their handicaps. This is not to say that no problems will arise in the course of implementing this general command. But it does suggest that abstention was not a compulsory step, particularly at this stage of the proceedings.
 
 
 48
 Even granting that there is some ambiguity in the state enactments, we believe that other factors rendered the district court's decision not to abstain an act that was within its discretion. In particular, we must take into account two factors: (a) the motion for abstention was made more than one year after the complaint was filed, and (b) for the trial court to have withdrawn from adjudication would have caused an extended delay in the ultimate disposition of this litigation. The Supreme Court has stated on several occasions that the possibility of substantial retardation in the progress of a lawsuit and consequent prejudice to the rights of plaintiffs are considerations indicating that abstention is not called for in a particular situation.[62] In the case at bar, the delays which accompany abstention would be particularly serious, since they would cause many members of the plaintiff class to pass through the Philadelphia school system without receiving the education that they allege is their statutory and constitutional due.
 
 
 49
 The opinion of the Second Circuit in Reid does not, in our view, conflict with the decision reached here. Reid came to the Second Circuit in a posture that was markedly different from that of the present litigation. There, the district court had found that abstention was an appropriate response, one that the Court of Appeals could not deem erroneous. Certainly, if Judge Newcomer had decided to abstain in the case before him, the question for review would be considerably altered. However, he elected not to abstain, and our task is to determine only whether such action constituted an abuse of discretion.
 
 
 50
 Additionally, the Second Circuit noted in Reid that an expeditious resolution of the relevant state law problems was likely since lawsuits addressing those questions were already pending in state court. That would certainly minimize the possibility that abstention would significantly prejudice the rights of the plaintiffs. Here, however, no such lawsuits are pending, and there appear to be no factors that would reduce the probability that abstention could lead to harm to members of the plaintiff class.[63]
 
 
 51
 We conclude, therefore, that it was not an abuse of discretion for the district court to decline to abstain at this time. The importance of the fact that we have been presented with a decision declining to abstain should be emphasized. Judge Newcomer has left open the possibility that he might reconsider the abstention question if further proceedings, particularly those concerning the educational services that the District may have to provide to members of the plaintiff class, tendered difficult and sensitive questions of state law.[64] If he should decide to abstain at that point, we would be confronted with a very different question for review, and we express no opinion as to such a question at this time.
 
 V. IDENTIFICATION OF STUDENTS
 
 52
 We now turn to the remaining issue, namely, whether Judge Newcomer erred in requiring the District to identify all learning disabled students in the system.
 
 
 53
 The District maintains that such an order goes beyond the Pennsylvania statutory mandate. Under Pennsylvania law, only "exceptional" children are entitled to special educational services.[65] And "exceptional" children are those who are sufficiently abnormal so as to require special services.[66] The District concedes that some learning disabled students fit within the "exceptional" category inasmuch as their disorders are so serious that they cannot benefit from regular education. However, the District continues, not all learning disabled children are necessarily "extraordinary children," since some can benefit from a standard educational program and are consequently not in need of special educational services. Because not all learning disabled students must be given a special education under state law, the District concludes that the state statutes and regulations do not require it to identify all learning disabled students.
 
 
 54
 In reply, the plaintiffs have put forward a series of contentions to support Judge Newcomer's conclusion. They urge, first, that the state regulations indicate that all learning disabled students are to be considered "exceptional" children. This is so, they assert, since one of the subcategories of "exceptional" children "handicapped school-aged persons" is defined as including "learning disabled" children.[67]
 
 
 55
 The plaintiffs also propose a more functional argument. They note that a large proportion of the learning disabled students in the Philadelphia public school system are presently unidentified. If such students were identified, it might be ascertained that some of them are not in need of special education. However, the plaintiffs add, the only means by which it can be determined which learning disabled children are "exceptional," and thus entitled under state law to special services, is to identify the entire population of learning disabled children, to assess the severity of the disability of each of them, and thereby to determine whether they are in need of special education.
 
 
 56
 We find this latter proposition to be persuasive. Identification is a means to the end of assuring that those children who are entitled to special educational services receive them. The District's present identification methods, as Judge Newcomer found, are somewhat haphazard and ineffective.[68] As noted above, only 1300 of the estimated 8000 learning disabled students in the system are presently identified. It is possible that, as the District claims, many or most of these unidentified learning disabled students do not need special educational services or are currently receiving adequate remedial services. However, so long as these students are unidentified and the nature and extent of their learning disabilities go unassessed, it will be impossible to know with any certainty whether the District is discharging its statutory obligation regarding these pupils. It would thus appear that the only way to assure that all students who require special educational services receive "appropriate" training pursuant to state law is for the District to adopt procedures calculated to isolate the entire population of learning disabled students and to evaluate the need of these pupils for special educational services. This is what Judge Newcomer ordered, and we cannot say that he misconstrued the mandate of Pennsylvania law in so holding.
 
 
 57
 It is important to emphasize those matters upon which we express no opinion. We do not rule upon the content of the education that Pennsylvania law requires the District to provide to its "exceptional" children. Nor do we address the problem of precisely which students must be given an "appropriate" education under the relevant statutes and regulations. We hold only that Judge Newcomer did not err in ordering that the District, in order to meet its statutory obligations towards "exceptional" children, must initially identify and evaluate all learning disabled students.
 
 
 58
 The order of the district court insofar as it mandates the identification of all learning disabled students in the District will be affirmed.[69]
 
 
 
 [1]
 For the purposes of the present litigation, the parties have accepted the definition of learning disabled children adopted by the Pennsylvania Department of Education:
 "Learning disabled pupils are those children who have a disorder in one or more of the basic psychological processes involved in understanding or in using language, spoken or written, which disorder may manifest itself in imperfect ability to listen, think, speak, read, write, spell, or do mathematical calculations. Such disorders include such conditions as perceptual handicaps, brain injury, minimal brain dysfunction, dyslexia, and developmental aphasia. Such term does not include children who have learning problems which are primarily the result of visual, hearing, or motor handicaps, or mental retardation, or emotional disturbance, or of environmental disadvantage."
 This definition is also included in the Education of the Handicapped Act, 20 U.S.C. § 1401(15).
 
 
 [2]
 Frederick L. v. Thomas, 419 F.Supp. 960 (E.D.Pa.1976)
 
 
 [3]
 See Notice of Proposed Rulemaking, Assistance to States for Education of Handicapped Children, 41 Fed.Reg. 52404 (1976)
 
 
 [4]
 See Frederick L. v. Thomas, 419 F.Supp. 960, 963-64 (E.D.Pa.1976)
 
 
 [5]
 Id. at 963. It is possible that as much as seven per cent of the population suffers from learning disorders. See id
 
 
 [6]
 See Notice of Proposed Rulemaking, Assistance to States for Education of Handicapped Children, 41 Fed.Reg. 52404-05 (1976)
 
 
 [7]
 Judge Newcomer noted that this estimate indicated that the incidence of learning disabilities in the District is above the national average. There are several factors that may account for this. Philadelphia has a large amount of poor people, among whom there is a lower quality of prenatal and early childhood care and a greater frequency of untreated birth injuries. Moreover, the district court found that Philadelphia has a large parochial school system which tends to retain normal students, while passing those with learning disabilities on to the public schools. See Frederick L. v. Thomas, 419 F.Supp. 960, 963 (E.D.Pa.1976)
 
 
 [8]
 The following findings were made to support this conclusion: (1) teachers often do not make referrals for students whose academic performance is poor but who do not engage in disruptive activities; and (2) teachers frequently do not make referrals since they believe that there are no suitable programs for the students. See id. at 965
 
 
 [9]
 See text this page
 
 
 [10]
 See Frederick L. v. Thomas, 419 F.Supp. 960, 968-69 (Table I) (E.D.Pa.1976) for a listing of these services
 
 
 [11]
 This is not to indicate that all students in kindergarten through fourth grade who need special educational services are receiving them
 
 
 [12]
 These services are set forth at 419 F.Supp. at 969-70 (Table II)
 
 
 [13]
 See id. at 970 (Table III)
 
 
 [14]
 It appears that different Department of Education officials review the educational plan and the accompanying budget. Thus it is possible, as happened in the case of the District, that the Department might approve a plan without authorizing an adequate appropriation of funds to support the new program. See id. at 967
 
 
 [15]
 See Pa.Stat.Ann. tit. 24, §§ 13-1371 et seq. (1962)
 
 
 [16]
 Pa.Stat.Ann., tit. 24, § 13-1371(1) (1962)
 
 
 [17]
 Id. § 13-1371(2)
 
 
 [18]
 Id. § 13-1372(1)
 
 
 [19]
 Id. § 13-1372(2)-(3)
 
 
 [20]
 Id. § 13-1372(3)
 
 
 [21]
 22 Pa. Code § 13.1 et seq. It should be noted that these regulations were promulgated after this lawsuit was filed
 
 
 [22]
 22 Pa. Code § 13.1
 
 
 [23]
 Id
 
 
 [24]
 Id
 
 
 [25]
 Id. § 13.6
 
 
 [26]
 Id. § 13.11. See also id. § 13.2
 The regulations define an appropriate program as "a program of education or training for exceptional school-aged persons which meets their individual needs as agreed to by a parent, school district or intermediate unit personnel; or as ordered by a hearing officer; or upon appeal as ordered by the Secretary of Education." Id. § 13.1.
 
 
 [27]
 Id. § 13.11(e)
 
 
 [28]
 The Delaware Valley Association for Children with Learning Disabilities intervened as a plaintiff
 
 
 [29]
 The motion also suggested that the case had become moot
 
 
 [30]
 See Frederick L. v. Thomas, 408 F.Supp. 832 (E.D.Pa.1976)
 
 
 [31]
 The relevant precedents hold that constitutional claims are not to be dismissed, unless they are plainly without merit. See Hagans v. Lavine, 415 U.S. 528, 536-38, 94 S.Ct. 1372, 39 L.Ed.2d 577 (1974) and cases cited therein
 Judge Newcomer also rejected the mootness contention. This point has not been pressed on appeal and we cannot say that the district court erred in reaching its conclusion.
 
 
 [32]
 Frederick L. v. Thomas, 419 F.Supp. 960 (E.D.Pa.1976)
 
 
 [33]
 This was in conformance with the practice suggested by the Supreme Court in Hagans v. Lavine, 415 U.S. 528, 546, 94 S.Ct. 1372, 39 L.Ed.2d 577 (1974)
 
 
 [34]
 See 419 F.Supp. at 971, 972, 975-79
 
 
 [35]
 See id. 971-72, 973-74
 Additionally, Judge Newcomer concluded that the District had violated its duty to provide special educational services in accordance with an approved plan. Id. at 972.
 
 
 [36]
 In subsequent remedial orders, Judge Newcomer has appointed a master and provided for her compensation
 
 
 [37]
 288 F.2d 600 (2d Cir. 1961). See also Bradley v. Milliken, 468 F.2d 902 (6th Cir. 1972), cert. denied, 409 U.S. 844, 93 S.Ct. 45, 34 L.Ed.2d 83 (1974)
 
 
 [38]
 Taylor v. Board of Education, 191 F.Supp. 181 (S.D.N.Y.1961)
 
 
 [39]
 See 288 F.2d at 601 n.1
 
 
 [40]
 Id. at 602. Judge Moore dissented. See id. at 606-07
 
 
 [41]
 Id. at 604
 
 
 [42]
 Id. at 605-06
 
 
 [43]
 326 F.2d 616 (5th Cir.), cert. denied, 377 U.S. 924, 84 S.Ct. 1223, 12 L.Ed.2d 216 (1964); see also Board of Education v. Dowell, 375 F.2d 158 (10th Cir.), cert. denied, 387 U.S. 931, 87 S.Ct. 2054, 18 L.Ed.2d 993 (1967); 9 J. Moore, Federal Practice P 110.20(1) at 234.1-235 (2d ed. 1975). Cf. Arthur v. Nyquist, 547 F.2d 7 (2d Cir. 1976)
 
 
 [44]
 See 326 F.2d at 616 n. 1
 
 
 [45]
 Judge Jones dissented. See id. at 621-22
 
 
 [46]
 Id. at 619 (emphasis in the original)
 
 
 [47]
 See id
 
 
 [48]
 See, e. g., Bachowski v. Usery, 545 F.2d 363, 373-74 (3d Cir. 1976). Cf. Carlsberg Resources Corp. v. Cambria Savings and Loan Assn., 554 F.2d 1254 at 1256-1257 (3d Cir. 1977) (jurisdictional questions in general)
 
 
 [49]
 We believe, however, that this factor suggests that consideration of the segment of Remedial Order Number 1 which mandates the eventual submission of interim and final plans for the appropriate education of all learning disabled children in the District is premature. The scope and content of the educational plan that the district court approves may very well alter our perspective and could change the legal issues that are presented. Thus, we shall not pass upon the question whether Judge Newcomer erred in concluding that, under Pennsylvania law, all learning disabled children must receive an "appropriate" education and that the District was not providing it
 Since we are deferring review of these problems, consideration of another of the District's contentions that Judge Newcomer erred by not ordering the Commonwealth to provide funding for the expanded services that his opinion might ultimately require would also seem inappropriate at this time. This is so since the issue will be in concrete form only after appellate consideration of all of Judge Newcomer's conclusions of law and after the precise educational program that may be required is approved.
 
 
 [50]
 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941)
 
 
 [51]
 See Bellotti v. Baird, 428 U.S. 132, 146-47, 96 S.Ct. 2857, 49 L.Ed.2d 844 (1976); Colorado River Water Cons. Dist. v. United States, 424 U.S. 800, 813-15, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976); Harris County Comm'rs Court v. Moore, 420 U.S. 77, 82-84, 95 S.Ct. 870, 43 L.Ed.2d 32 (1975); Lake Carriers' Assn. v. MacMullen, 406 U.S. 498, 509-10, 92 S.Ct. 1749, 32 L.Ed.2d 257 (1972); P. Bator, P. Mishkin, D. Shapiro & H. Wechsler, Hart and Wechsler's The Federal Courts and The Federal System, 985-97 (2d ed. 1973); G. Gunther, Constitutional Law 1606-09 (9th ed. 1975); C. Wright, Law of Federal Courts, 218-29 (3d ed. 1976); Field, The Abstention Doctrine Today, 125 U.Pa.L.Rev. 590 (1977); Field, Abstention in Constitutional Cases: The Scope of the Pullman Abstention Doctrine, 122 U.Pa.L.Rev. 1071 (1974)
 
 
 [52]
 See, e. g., Harris County Comm'rs Court v. Moore, 420 U.S. 77, 83, 95 S.Ct. 870, 43 L.Ed.2d 32 (1976); Lake Carriers' Assn. v. MacMullen, 406 U.S. 498, 509, 92 S.Ct. 1749, 32 L.Ed.2d 257 (1972)
 
 
 [53]
 See, e. g., Harris County Comm'rs Court v. Moore, 420 U.S. 77, 83, 95 S.Ct. 870, 43 L.Ed.2d 32 (1976); Zwickler v. Koota, 389 U.S. 241, 248, 88 S.Ct. 391, 19 L.Ed.2d 444 (1976)
 
 
 [54]
 Conover v. Montemuro, 477 F.2d 1073, 1079-80 (3d Cir. 1973)
 
 
 [55]
 453 F.2d 238 (2d Cir. 1971)
 
 
 [56]
 Id. at 243
 
 
 [57]
 Id
 
 
 [58]
 See id. at 243 n. 9
 
 
 [59]
 See id
 
 
 [60]
 See Harris County Comm'rs Court v. Moore, 420 U.S. 77, 83, 95 S.Ct. 870, 875, 43 L.Ed.2d 32 (1975)
 
 
 [61]
 See, e. g., Field, Abstention Constitutional Cases: The Scope of the Pullman Abstention Doctrine, 122 U.Pa.L.Rev. 1071, 1088-89 (1974)
 
 
 [62]
 See, e. g., Bellotti v. Baird, 428 U.S. 132, 150, 96 S.Ct. 2857, 49 L.Ed.2d 844 (1976); Harris County Comm'rs Court v. Moore, 420 U.S. 77, 83, 95 S.Ct. 870, 43 L.Ed.2d 32 (1975); England v. Medical Examiners, 375 U.S. 411, 418, 84 S.Ct. 461, 466, 11 L.Ed.2d 440 (1964); Lake Carriers' Assn. v. MacMullen, 406 U.S. 498, 92 S.Ct. 1749, 32 L.Ed.2d 257 (1972); Conover v. Montemuro, 477 F.2d 1073, 1080 (3d Cir. 1973)
 
 
 [63]
 Indeed, the significant delays that face civil litigants in the Philadelphia Court of Common Pleas would not seem to augur well for an expeditious resolution of any state court action. Moreover, we note that Pennsylvania lacks a procedure by which federal courts can certify state law issues to the state courts. Cf. Bellotti v. Baird, 428 U.S. 132, 150-51, 96 S.Ct. 2857, 49 L.Ed.2d 844 (1976) (Supreme Court indicated that availability of a certification procedure is a factor that cuts in favor of abstention.)
 
 
 [64]
 See Frederick L. v. Thomas, 408 F.Supp. 832, 841 (E.D.Pa.1976)
 
 
 [65]
 See Pa.Stat.Ann., tit. 20, §§ 13-1371 et seq. (1962)
 
 
 [66]
 Id. § 13-1371(1)
 
 
 [67]
 See 22 Pa.Code § 13.1
 
 
 [68]
 See Frederick L. v. Thomas, 419 F.Supp. 960, 965-66 (E.D.Pa.1976)
 
 
 [69]
 At oral argument, counsel for the Commonwealth asserted for the first time, that the Commonwealth should be dismissed as a party for lack of subject matter jurisdiction. The basis for the request was the contention that the Commonwealth is not a "person" for the purposes of 42 U.S.C. § 1983. This is a somewhat unusual request, in view of the fact that the Commonwealth, of its own accord, moved to intervene as a party in the district court and wielded the laboring oar in seeking dismissal of the complaint or abstention. At this point, the most satisfactory course of action would be for the Commonwealth first to present a motion to dismiss to the district court, in order to allow Judge Newcomer and the Commonwealth's attorney to determine what the Commonwealth's future role in the litigation would be if dismissal is required