Dorothy HOOTS, Individually and as mother of her children Janelle Hoots and Jamie Hoots, Mrs. Addrallace Knight, Individually and as mother and natural guardian of her children Ronald Knight, Loretta Knight, Terrence Knight, Pamela Knight, Darryl Knight, Marc Knight and Byron Knight, Barbara Smith, Individually and as mother and natural guardian of her children Tawanda Smith, Tevela Smith, Joseph Smith, Wesley Smith and Eric Smith, on behalf of themselves and all others similarly situated, Appellants,

v.

COMMONWEALTH OF PENNSYLVANIA, Edward X. Hallenberg, President of the Allegheny County Board of School Directors, the Allegheny County Board of School Directors, W. Deming Lewis, Chairman of the Pennsylvania State Board of Education, the Pennsylvania State Board of Education, Michael Sullivan, President of the School District of the Borough of Braddock, the School District of the Borough of Braddock, Andrew Lisyak, President of the School Board of the School District of the Borough of Rankin, the School District of the Borough of Rankin, Leo Campbell, President of the School Board of the School District of the Borough of North Braddock, the School District of the Borough of North Braddock, the Allegheny Intermediate Unit Board of School Directors and Edward X. Hallenberg, President of the Allegheny Intermediate Board of School Directors.

No. 78–1224.

United States Court of Appeals, Third Circuit.

Argued Sept. 6, 1978.

Decided Oct. 27, 1978.

Thomas C. Reed, Irvin S. Bails, James Shilliday, Pittsburgh, Pa., for appellants.

Goehring, Rutter & Boehm, Thomas M. Rutter, Jr., Pittsburgh, Pa., for appellee Allegheny Intermediate Unit.

Allen C. Warshaw, Deputy Atty. Gen., J. Justin Blewitt, Jr., Deputy Atty. Gen., Chief, Civil Litigation, Robert P. Kane, Atty. Gen., Dept. of Justice, Harrisburg, Pa., for appellees Commonwealth of Pennsylvania, its Board of Education and W. Deming Lewis.

J. Robert Maxwell, Maxwell & Huss, Pittsburgh, Pa., for intervenor Churchill Area School District.

Before GIBBONS, HUNTER and GARTH, Circuit Judges.

## OPINION OF THE COURT

GARTH, Circuit Judge.

Plaintiffs, mothers of children who attend public schools in the General Braddock School District in Allegheny County, Pennsylvania, brought this action on behalf of themselves and other parents of children attending those schools,[1] alleging that the consolidation of various school districts in that county had created racially segregated schools. The district court, in an opinion and order filed on May 15, 1973, held that the creation of the General Braddock School District by the Pennsylvania State Board of Education was an act of *de jure* discrimination in violation of the fourteenth amendment.[2] The defendants were ordered to prepare and submit to the court a plan for desegregation which was to include modifications in the boundary lines of the General Braddock School District and, "as appropriate, of adjacent and/or near-by school districts."[3] A plan designated as Plan "22–W" was submitted in 1973 but was rejected

---

1. The district court, in an order dated March 21, 1972, certified a class of "all parents whose children are attending or will attend public schools within the General Braddock Area School District individually and as parents of and on behalf of their children."

2. *Hoots v. Pennsylvania*, 359 F.Supp. 807, 823, 824 (W.D.Pa.1973).

3. *Id.* at 824.

by the court after a hearing. Thereafter, in 1975, the Commonwealth filed a plan (Plan "A") for the consolidation of the General Braddock School District with neighboring districts. In an opinion and order filed on November 18, 1977, the district court denied the Commonwealth's motion for approval of Plan A. The district court's order reads as follows:

> And Now, *November 18, 1977* the Motion of Defendant Commonwealth of Pennsylvania for approval of its Reorganization Plan [Plan A] filed September 30, 1975 in this matter (Docket No. 178) is hereby Denied and any necessary injunctive order to implement such plan is likewise Denied, without prejudice to the right of any party to submit further plans or proposals and evidence in support thereof. Any such plan involving the joinder or consolidation of school districts not now parties of record must be accompanied by the necessary joinder of such parties.

Because we hold that the district court's order of November 18, 1977 is neither a final order nor an appealable interlocutory order which can vest this Court with appellate jurisdiction, we are obliged to dismiss plaintiffs' appeal.

### I.

Prior to 1971, the area presently included in the General Braddock School District was served by the school districts of the Boroughs of Braddock, North Braddock and Rankin.[4] In 1968, the Pennsylvania legislature, pursuant to its longstanding policy of consolidating school districts, enacted Pub.L. 299, No. 150, Pa.Stat.Ann. tit. 24, § 2400.1 et seq. (Purdon Supp.1978) ("Act 150"), which directed the county school boards to prepare and submit to the state board of education plans for the reorganization of their constituent school districts.[5] The state board promulgated standards for the approval of such plans.[6] The standards provided for consideration of, *inter alia*, pupil population, community characteristics, and facilities; however, race was not to be a factor in the formulation of any plan.[7]

After considering plans which would have consolidated the schools in the Boroughs of Braddock, North Braddock and Rankin with the school districts in neighboring municipalities which have predominantly white enrollments,[8] the county board, on October 7, 1968, approved a plan which created the General Braddock School District as the school system for the three boroughs. The adjacent Turtle Creek and Swissvale Area School Districts and the nearby Edgewood School District were created under that plan as well. The state board approved the formation of the General Braddock School District on May 9, 1969, and the new district came into being on July 1, 1971.[9]

On June 9, 1971, the plaintiffs' complaint in this action was filed. As thereafter amended, it alleged two causes of action under the equal protection clause of the fourteenth amendment and under 42 U.S.C. §§ 1981, 1983 (1970). In Count I, the plaintiffs alleged that the defendants, the Pennsylvania State Board of Education and the Allegheny Intermediate Unit Board of School Directors,[10] had intentionally and

---

4. A more detailed account of the formation and subsequent history of the General Braddock School District may be found in the opinion of the district court. *Id.* at 811–20.

5. Act 150 did not empower the county and state boards to reorganize, without their consent, districts which had been organized under a prior statute, Pa.Stat.Ann. tit. 24, § 2–296 et seq. (Purdon Supp.1978) ("Act 299"). *See* Pa. Stat.Ann. tit. 24, § 2400.1, 2400.2 (Purdon Supp.1978). Consequently, many school districts in Allegheny County, including the Churchill, Mifflin and East Allegheny School Districts, were not subject to mandatory reorganization under Act 150.

6. The standards were adopted pursuant to Pa. Stat.Ann. tit. 24, § 2400.1 (Purdon Supp.1978).

7. The standards are set out in the opinion of the district court, 359 F.Supp. at 812–13.

8. *Id.* at 817–18.

9. *Id.* at 813.

10. Also named as parties in the amended complaint filed on July 30, 1971 were the Commonwealth of Pennsylvania, Edward Hallenberg (President of the Allegheny Intermediate Unit Board of School Directors), the Allegheny

knowingly established the boundary lines of the General Braddock School District so as to create a racially segregated district. Count II alleged that the school district so established lacked the economic resources to provide educational opportunities comparable to those available to pupils attending public schools in the surrounding districts. After trial, the district court filed an opinion and order on May 15, 1973, in which, after recording its findings of fact and conclusions of law, it held that the demarcation of the boundaries of the General Braddock School District by the county and state boards was "an act of *de jure* discrimination in violation of the Fourteenth Amendment." [11]

The district court found that the percentage of non-white enrollment was "much greater" in the General Braddock School District than in any of the surrounding districts or in almost any other district in Allegheny County.[12] It further found that the school-age population of Braddock, North Braddock and Rankin was becoming increasingly non-white and that this trend had been accelerated by the establishment of the General Braddock School District.[13] It was the court's conclusion that the defendants knew or should have been aware of these facts in 1968–1969, and that they must have known that the establishment of General Braddock as a school district would "perpetuate, exacerbate and maximize segregation of school pupils." [14] The district court found that the board's purpose in forming the General Braddock School District was not to further any educational goals but was "to satisfy the desires of as many of the surrounding municipalities as possible to be placed in a school district *which did not include Braddock and Rankin.*" [15] The district court, after finding that the school district boundaries in the central eastern area of Allegheny County bore no rational relation to any legitimate purpose, thereupon concluded that "race was a factor, at least indirectly, in the formation of the school district composed of Braddock, North Braddock and Rankin." [16]

County Board of School Directors (the administrative body which was superseded in 1971 by the Allegheny Intermediate Unit Board of School Directors), and W. Deming Lewis (President of the Pennsylvania State Board of Education). In the original complaint filed on June 9, 1971, the school districts for the Boroughs of Braddock, Rankin and North Braddock and their presidents had also been named as defendants; they were deleted as parties in the amended complaint.

| Population in 1970 | Black | Total | % Black |
|---|---|---|---|
| Edgewood | 66 | 5101 | 1.29 |
| Forest Hills | 26 | 9561 | .27 |
| North Versailles | 1025 | 13416 | 7.64 |
| Swissvale | 567 | 13891 | 4.10 |
| Turtle Creek | 15 | 8308 | .18 |
| Wall | 32 | 1265 | 2.53 |
| Wilkins | 49 | 8479 | .56 |
| Wilmerding | 94 | 3218 | 2.92 |

11. *Hoots v. Pennsylvania*, 359 F.Supp. 807, 823 (W.D.Pa.1973).

12. 359 F.Supp. at 816. Findings of fact were made regarding the racial composition of the General Braddock School District, *id.* at 814–16, including comparative data for the municipalities in the central eastern area of Allegheny County:

| Population in 1970 | Black | Total | % Black |
|---|---|---|---|
| Braddock | 3139 | 8682 | 36.16 |
| North Braddock | 1194 | 10838 | 11.02 |
| Rankin | 1351 | 3817 | 35.39 |
| Chalfont | 12 | 1370 | .88 |
| Churchill | 5 | 4690 | .11 |
| East McKeesport | 26 | 3233 | .80 |
| Braddock Hill | 293 | 2494 | 11.75 |
| East Pittsburgh | 116 | 3006 | 3.85 |

13. *Id.* at 815.

14. *Id.* at 823.

15. *Id.* at 821. The district court made the following fact-finding:

"39. *The school districts in the vicinity of Braddock and Rankin continually sought to avoid being included in a school district with Braddock and Rankin because of the high concentration of blacks within the Braddock and Rankin School Districts. These surrounding districts proposed to the County and State Boards mergers that would include almost any school districts in the vicinity other than Braddock and Rankin.*"
359 F.Supp. at 816–17.

16. *Id.* at 821.

In the Order which was also filed on May 15, 1973,[17] the district court required the defendants Commonwealth of Pennsylvania, the state board and its chairman ("the Commonwealth defendants") to submit within forty-five days a comprehensive plan for school desegregation in the central eastern area of Allegheny County. The court directed that the plan was to go into effect as soon as possible and that it was to be an educationally sound and practicable mode of achieving the greatest possible degree of desegregation. The order also required that the plan "alter the boundary lines of the General Braddock Area School District and, as appropriate, of adjacent and/or near-by school districts."[18]

Approximately one month after the May 15, 1973 Order had been entered and two years after the action had been commenced, two of the districts adjacent to the General Braddock district, Turtle Creek and Churchill, filed petitions to intervene as parties in interest. The district court denied the petitions but subsequently invited all districts (including Turtle Creek and Churchill) which would be directly affected by the Commonwealth's desegregation plans to intervene for the limited purpose of offering objections to those plans.[19] Turtle Creek and Churchill again sought to intervene generally (as distinct from the limited intervention allowed by the court).[20] Their peti-

---

17. ORDER

And now, this 15th day of May, 1973, this Court having found that the County and State Boards acted contrary to the Constitution in adopting the plan of organization of administrative units which combined Braddock, North Braddock and Rankin into a single school district, it is hereby ordered and directed that:

(1) Defendants Commonwealth of Pennsylvania, The Pennsylvania State Board of Education, and W. Deming Lewis shall prepare and submit to this Court within 45 days from the date of this Order a comprehensive plan of school desegregation for the central eastern area of Allegheny County to remedy the Constitutional violations found by this Court, which plan shall become final unless objected to by plaintiffs within 20 days after it is filed with the Court.

(2) Such plan shall meet the following standards:

(a) the plan shall alter the boundary lines of the General Braddock Area School District and, as appropriate, of adjacent and/or nearby school districts.

(b) the plan shall be an educationally sound and practical plan of desegregation that promises now and hereafter to achieve the greatest possible degree of desegregation within the public schools of the central eastern area of Allegheny County, taking into account the practicalities of the situation.

(c) the plan shall set forth the dates on which it shall go into effect, which dates shall be set as early as possible.

(3) Defendants Allegheny Intermediate Unit Board of School Directors, and Edward Hallenberg, its President, shall assist in the preparation of the plan in all respects within their special area of responsibility and to the fullest extent render the benefits of their expertise and knowledge of local facilities and resources so that the terms of this order may be carried out by the other Defendants.

(4) In preparing said desegregation plan it is anticipated that defendants will consider the factor of racial balance along with other educationally relevant criteria and that the plan submitted by defendants will be consistent with the policies of the Department of Public Instruction and Human Relations of Pennsylvania relating to school integration.

(5) Defendants shall give each school district whose boundaries may be altered by said school desegregation plan the opportunity to be heard prior to the adoption of a final plan.

(6) Until said school desegregation plan is finally approved by this Court, defendants are hereby enjoined and restrained from taking any action, directly or indirectly, that may in any way limit or otherwise affect any school assignment options that could possibly be considered or proposed by any parties to this action.

(7) This Court expressly retains complete and continuing jurisdiction to modify this final judgment and decree on its own motion or on motion of any party.

(8) This judgment and decree shall take effect immediately.

359 F.Supp. at 824–25.

18. Id. at 824.

19. The Churchill, Wilkinsburg, Swissvale and East Allegheny school districts subsequently intervened for the limited purpose of offering evidence and argument regarding the plans submitted by the Commonwealth defendants.

20. The Swissvale, East Allegheny, and Edgewood Area school districts also petitioned for intervention at that time; Edgewood's petition was subsequently withdrawn and the other petitions were denied.

tions were denied, and each filed an appeal. This Court affirmed the district court's orders denying general intervention on the ground that, under *NAACP v. New York*,[21] it was within the district court's discretion to deny petitions which had not been timely made.[22]

In· compliance with the court's May 15, 1973 order,[23] the Commonwealth defendants filed Plan "22–W" in September, 1973. That plan, among other features, would have abolished the General Braddock School District and created two new school districts. One district would have included the Borough of Rankin with other districts with predominantly white enrollments, and the other new district would have included the Braddock and North Braddock schools with still other surrounding districts. The school districts affected by this plan were permit-

ted to intervene to offer evidence regarding Plan 22–W.[24] In an order and memorandum opinion filed on May 7, 1975, the district court, after holding extensive hearings,[25] rejected Plan 22–W. The defendants were then ordered to prepare another plan which would comport with the evidence adduced at the hearing by the parties and the intervening school districts.[26]

Thereafter, in September, 1975, the Commonwealth defendants submitted "Plan A". Although, in the opinion of the district court, Plan A constituted a "more moderate realignment" of school district boundaries,[27] the district court nonetheless denied the defendants' motion for approval of the plan. In its opinion of November 18, 1977, the district court concluded that the plan "would not be in the best interests of the

**21.** 413 U.S. 345, 93 S.Ct. 2591, 37 L.Ed.2d 648 (1973).

**22.** On May 19, 1972, eight months prior to the trial of this action, the Attorney General for the Commonwealth wrote to four of the school districts in the vicinity of General Braddock. The letter enclosed a copy of the plaintiffs' amended complaint and urged the school districts to intervene, advising them that the relief which the plaintiffs had requested might alter the boundaries of their particular districts. When, prior to trial, the defendants moved to have the adjacent school districts joined as necessary parties under Fed.R.Civ.P. 19, notice of the impending trial was again given to each of these districts.

The district court rejected the defendants' Fed.R.Civ.P. 19 motion in its opinion of May 15, 1973, noting that the surrounding districts had no right to their present boundaries. 359 F.Supp. at 821–22. The district court also recognized that, although each of the districts deemed to be necessary parties by the defendants had been made aware of the instant action, none had requested intervention. However, the district court indicated that it might become necessary "at some further stage of the proceedings" to join the surrounding school districts. *Id.* at 822.

**23.** Time for submission of the Commonwealth's plan had been extended until September 26, 1973 by order of the court dated July 12, 1973. The plan designated as Plan "22–W" was submitted to the court on September 26, 1973.

**24.** *See* note 19 *supra*.

**25.** The court deferred its consideration of the plan until *Milliken v. Bradley*, 418 U.S. 717, 94 S.Ct. 3112, 41 L.Ed.2d 1069 (1974) (*Milliken I*),

had been decided by the Supreme Court; after that opinion had been filed, briefs were submitted regarding its effect on the instant case.

**26.** The order required the defendants to:

". . . prepare and submit to this court and to the counsel for the parties to this action a comprehensive plan of school desegregation to remedy the constitutional violations found by this court to exist in the structure of the General Area Braddock School District [sic] in Allegheny County, Pennsylvania. In formulating such plan the Commonwealth, and its Departments and Agencies concerned with responsibility in this matter shall consider the evidence submitted by the various parties at the hearings held by the court on this matter and the alternative proposals advanced by various parties at such hearing. The Commonwealth shall further consider the factors of community acceptance, financial impact, the neighborhood school concept, and minimization of required transportation to effectuate the plan, the existence of present facilities and the planning of future facilities in the areas affected, as well as the other factors for determination of an acceptable plan that were developed in the hearing before this court on the subject."

**27.** Under Plan A, Rankin would have been combined with Swissvale and Edgewood; North Braddock would have been combined with Turtle Creek, and Braddock would have been combined with Churchill. Alternative plans were submitted by some of the surrounding school districts; these too involved some form of linkage between the component schools of the General Braddock district and nearby districts.

students in the present General Braddock area school system."

The district court also questioned whether, under *Milliken v. Bradley,*[28] it had the power to order the proposed relief. The district court expressed its belief that *Milliken* "raises doubts about the application of an inter-district remedy to districts that have not been full participants in all proceedings." Accordingly, the district court required, in its order, that any school district included in a desegregation plan be joined as a necessary party.

The Order filed on November 18, 1977 thereupon denied the defendants' motion for approval of Plan A. It further denied "any necessary injunctive order to implement such plan . . . without prejudice to the right of any party to submit further plans or proposals and evidence in support thereof." It was from this order that the plaintiffs appealed.[29]

## II.

■ The jurisdiction of the courts of appeals normally is confined to the review of final orders, 28 U.S.C. § 1291 (1976)[30] or to the classes of interlocutory orders described in 28 U.S.C. § 1292(a) (1976).[31] Here, the plaintiffs have taken the position that the November 18, 1977 Order is either "final" within the meaning of § 1291, or that it comes within § 1292(a)(1) which permits appeals from certain types of injunctive orders.

## A.

■ The plaintiffs argue that an order denying a motion for the approval of a desegregation plan should be regarded as final within the meaning of 28 U.S.C. § 1291 (1976). In support of this proposition they rely primarily on *Kelley v. Metropolitan County Board of Education,* 436 F.2d 856 (6th Cir. 1970). In that case, it was determined that the schools of Nashville were subject to *de jure* discrimination, and the district court ordered that a desegregation plan be prepared. A plan was submitted by the school board, but before the merits of the plan had been considered by the district court, all proceedings in the case were stayed indefinitely pending decision by the Supreme Court of school desegregation cases then before it. The Court of Appeals for the Sixth Circuit ruled that an order "staying pupil integration proceedings for an indefinite time was final and is appealable under 28 U.S.C. § 1291," and vacated the stay.[32] The court relied on the admonition of the Supreme Court that in cases which fall into the " 'twilight zone' of finality," the final judgment rule should be given a " 'practical rather than technical construction.' "[33]

While we do not rule that there could never be circumstances in which an order which stayed all proceedings in a school desegregation case would be a "final" denial of relief, we are faced here with circumstances which are far different from those which confronted the Sixth Circuit in *Kel-*

**28.** 418 U.S. 717, 94 S.Ct. 3112, 41 L.Ed.2d 1069 (1974) *(Milliken I).*

**29.** Although the record does not reveal whether plaintiffs moved for the approval of Plan A as did the Commonwealth, the plaintiffs on November 7, 1975 did file a "Proposed Order of Court," under the terms of which the court would have approved the Commonwealth's plan.

**30.** Section 1291 provides:
The courts of appeals shall have jurisdiction of appeals from all final decisions of the district courts of the United States, . . . except where a direct review may be had in the Supreme Court.

**31.** Section 1292(a)(1) provides:
(a) The courts of appeals shall have jurisdiction of appeals from:
(1) Interlocutory orders of the district courts of the United States, . . . or of the judges thereof, granting, continuing, modifying, refusing or dissolving injunctions, or refusing to dissolve or modify injunctions, except where a direct review may be had in the Supreme Court.

**32.** 436 F.2d at 862.

**33.** *Gillespie v. United States Steel Corp.,* 379 U.S. 148, 152–53, 85 S.Ct. 308, 311, 13 L.Ed.2d 199 (1964), *quoting Cohen v. Beneficial Industrial Loan Corp.,* 337 U.S. 541, 546, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949).

*ley. Kelley*, it has been noted, involved an appeal from an order which stayed all proceedings for an indefinite time. In the present case, no stay has been decreed. However, we do not hold that the presence or absence of a final order turns on whether there has been a *formal* order staying the proceedings. Rather, we observe that in *Kelley* the district court stayed the proceedings before any consideration had been given to the remedial plan before it. By contrast, here the district court has given full consideration to the plan and rejected it on the merits. The November 18, 1977 Order entered in this case interposes no bar to further proposals for relief. Moreover, that order, by its terms, does not require that there be any more delay than may be necessary for the parties to prepare an appropriate plan.[34]

In these circumstances, for us to hold that the district court's order of November 18, 1977 is a "final decision" would not be consistent with "our circuit's disinclination to expand the class of appealable final orders."[35] This circuit has adhered to the position that "expansive judge-made exceptions to the final judgment rule" do not, in the long run, serve the goal of speedy justice.[36] To the extent that orders which are not final may be reviewed, 28 U.S.C. § 1292(b) (1976)[37] provides the appropriate procedure.[38]

Although the prospect that delay may impair important federal rights bears consideration in an appeal from an order which is in the "twilight zone" of the final judgment rule,[39] "the mere prospect of delay" may not create appellate jurisdiction where a final order has not been entered. *Brace v. O'Neill*, 567 F.2d 237, 243 n.27a (3d Cir. 1977). To place such a gloss on the final judgment rule in order to bring within its ambit cases in which the district court has failed to bring the litigation to an expeditious conclusion would, as Judge Adams has noted in his opinion for the court in *Bachowski v. Usery*,[40] be a disservice to the

---

34. The litigation in *Kelley* began fifteen years prior to the stay, a circumstance to which the court of appeals gave considerable weight. 436 F.2d at 858.

35. *Bachowski v. Usery*, 545 F.2d 363, 373 (3d Cir. 1976). *See also Rodgers v. United States Steel Corp.*, 508 F.2d 152, 159 (3d Cir. 1975), *cert. denied*, 423 U.S. 832, 96 S.Ct. 54, 46 L.Ed.2d 50 ("[T]his Court has always read *Cohen* as a narrow rather than an expansive exception to the final judgment rule"); *Hackett v. General Host Corp.*, 455 F.2d 618 (3d Cir.), *cert. denied*, 407 U.S. 925, 92 S.Ct. 2460, 32 L.Ed.2d 812 (1972).

36. *Bachowski v. Usery*, 545 F.2d 363, 371 (3d Cir. 1976).

37. Section 1292(b) provides in pertinent part as follows:

(b) When a district judge, in making in a civil action an order not otherwise appealable under this section, shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, he shall so state in writing in such order. The Court of Appeals may thereupon, in its discretion, permit an appeal to be taken from such order, if application is made to it within ten days after the entry of the order

. . . . .

38. *Bachowski v. Usery*, 545 F.2d 363, 373 (3d Cir. 1976); *Hackett v. General Host Corp.*, 455 F.2d 618, 623–24 (3d Cir.), *cert. denied*, 407 U.S. 925, 92 S.Ct. 2460, 32 L.Ed.2d 812 (1972).

39. *Gillespie v. United States Steel Corp.*, 379 U.S. 148, 152–53, 85 S.Ct. 308, 13 L.Ed.2d 199 (1964).

40. Judge Adams's opinion concludes with the following observation:

The substance of the dispute here is highly significant, and immediate resolution would clarify an important aspect of federal law as well as possibly terminating a lengthy controversy. However, the wisdom of the final judgment rule lies in its insistance that we focus on systemic, as well as particularistic impacts. The appellate system has become increasingly overburdened and the future would appear to promise no relief from the continuous increase in case loads. Accordingly, it would seem to us to be a disservice to the Court, to litigants in general and to the idea of speedy justice if we were to succumb to enticing suggestions to abandon the deeply-held distaste for piecemeal litigation in every instance of temptation. Moreover, to find appealability in those close cases where the merits of the dispute may attract the deep interest of the court would lead, eventually, *to a lack of principled adjudication or* perhaps the ultimate devitalization of the finality rule as enacted by Congress.
545 F.2d at 373–74.

important systemic concerns on which that rule is premised.

### B.

■ Recognizing that the November 18, 1977 order is interlocutory, we would nevertheless have appellate jurisdiction under 28 U.S.C. § 1292(a)(1) (1976) if that order was injunctive in character.[41] The plaintiffs have so argued, contending that our jurisdiction attaches because the November 18, 1977 order modifies the order of May 15, 1973, which the plaintiffs characterize as an injunction.[42]

■ For an interlocutory order to be appealable under 28 U.S.C. § 1292(a)(1)

(1976) as an order modifying an injunction, two requirements appear to be necessary and must be satisfied: (i) the original or prior order must have been injunctive in character, and (ii) that injunction must have been modified in some respect by the order from which the appeal has been taken. Neither requirement has been met here.

The only injunctive aspect of the May 15, 1973 order which later orders might conceivably have been deemed to have modified was its requirement that the Commonwealth defendants prepare and submit a plan for desegregation.[43] Whether an order which merely commands the preparation of

---

**41.** *See* note 37 *supra.*

**42.** Plaintiffs also contend that the November 18, 1977 order is an "interlocutory order of the district courts . . . refusing . . . [an] injunction." 28 U.S.C. § 1292(a)(1) (1976). Although the order, as drawn, denies "any necessary injunctive order to implement such plan," no element of the relief sought by plaintiffs has been denied by any provision of that order. It has been this Court's practice to examine the substantive effect of orders denominated as injunctions to determine whether they are within the purpose and ambit of section 1292(a)(1). This Court stated in *Stateside Machinery Co. v. Alperin*, 526 F.2d 480, 482 (3d Cir. 1975) (footnotes omitted):

> The denial of a motion for a preliminary injunction against further proceedings in an arbitration would seem at first blush to fall within the literal terms of § 1292(a)(1). But literalism has not been the approved canon of construction for the interlocutory appeals statute. Rather, the courts have looked to the presumed purpose of the 1891 exception to the historical rule prohibiting appeals from non-final judgments, and have classified as injunctions within the meaning of § 1292(a)(1) those interlocutory orders "of serious, perhaps irreparable consequence." *Baltimore Contractors, Inc. v. Bodinger*, 348 U.S. 176, 181, 75 S.Ct. 249, 252, 99 L.Ed. 233 (1955). The literal characterization of an order as an injunction only begins the inquiry into appealability.

*See also Rodgers v. United States Steel Corp.*, 541 F.2d 365, 372–73 (3d Cir. 1976).

The defendants' motion of September 30, 1975 which gave rise to the November 18, 1977 order sought no more than the approval of Plan A. It did not seek any injunction to implement that plan (if approved). Hence, the inclusion in the November 18, 1977 order of the language, "and any necessary injunctive order to imple-

ment such plan is likewise denied," was surplusage and, at best, incidental to the court's refusal to approve the defendants' plan. For once the motion for approval of that plan had been denied, there was no need or occasion for the court to go further and rule on the implementation of a plan which it had determined was not to go into effect.

Moreover, the order expressly invited "any party to submit further plans or proposals and evidence in support thereof." Therefore, read as an integrated whole, the November 18, 1977 order necessarily leads to the conclusion that it was never intended to and did not refuse a permanent injunction within the meaning of 28 U.S.C. § 1292(a)(1) (1976). *See generally* 16 Wright & Miller, *Federal Practice and Procedure* 87 (advocating a policy of strict construction of section 1292(a)(1); *Western Geophysical Co. v. Bolt Associates Inc.*, 463 F.2d 101, 104 (2d Cir.), *cert. denied* 409 U.S. 1040, 93 S.Ct. 523, 34 L.Ed.2d 489 (1972) (Section 1292(a)(1) "was intended as a narrow exception to the policy of the basic final judgment rule . . . . The great advantages of that policy in the administration of federal justice dictate against a reliance on the strict letter of § 1292(a)(1) which would cause the exception to encroach unduly upon the rule.").

**43.** In the May 15, 1973 order, the defendants were also enjoined from taking any actions which would impede formulation of a remedy. The order provided:

> (6) Until said school desegregation plan is finally approved by this Court, defendants are hereby enjoined and restrained from taking any action, directly or indirectly, that may in any way limit or otherwise affect any school assignment options that could possibly be considered or proposed by any parties to this action.

359 F.Supp. at 825. This injunctive aspect of the order cannot, however, support an appeal

a remedial plan constitutes an injunction within the meaning of § 1292(a)(1) presents a question which this Court has previously answered in *Frederick L. v. Thomas,* 557 F.2d 373 (3d Cir. 1977). In that case, the district court ordered the School District of Philadelphia to prepare and submit to a master a plan (i) for the identification of all "learning disabled" students, and (ii) for the appropriate placement of those students. This Court held that it had jurisdiction under § 1292(a)(1) of the school district's appeal, but only from the first ("identification") portion of the order. Consideration of the balance of the district court's order which concerned the interim and final plans for placement of students was held to be premature.[44] In his opinion for the court, Judge Adams reviewed decisions from other circuits addressing the issue which was presented in *Frederick L.* and which is also presented here, that is, whether an order to prepare a plan is an injunction under section 1292(a)(1). His analysis revealed substantial differences in the content of those orders which were held to be appealable and those which were not. He concluded that the controlling factor was whether the order specified the nature, requirements and extent of the relief to be afforded by the plan to be submitted.[45]

In his discussion of *Board of Public Instruction v. Braxton,*[46] a Fifth Circuit desegregation case, Judge Adams characterized the order which *Braxton* held to be appealable as one which dealt with "specific prohibited acts."[47] He noted that the court of appeals, which held this order to be re-

viewable under 28 U.S.C. § 1292(a)(1) (1976) had ruled that the "ordering of the plan dealing expressly with these prohibited acts amounts to a mandatory injunction."[48] In *Board of Education v. Dowell,*[49] another school desegregation case to which Judge Adams cited, the court held that it had jurisdiction of an appeal from an order requiring the defendants to submit a desegregation plan substantially identical to one which had previously been prepared for the court by a panel of experts.[50] Hence, the crucial element on which jurisdiction was predicated in both *Braxton* and *Dowell* was that the order from which appeal was taken specified the overall content or outline of the plan to be submitted.

On the other hand, Judge Adams observed that cases in the Second and Sixth Circuits in which appeals were dismissed for lack of jurisdiction involved orders which did not specify the nature or extent of the relief which the plans would afford. *Hart v. Community School Board,* 497 F.2d 1027 (2d Cir. 1974); *Taylor v. Board of Education,* 288 F.2d 600 (2d Cir. 1961); *Bradley v. Milliken,* 468 F.2d 902 (6th Cir. 1972), *cert. denied,* 409 U.S. 844, 93 S.Ct. 45, 34 L.Ed.2d 83 (1972). For instance, in *Hart,* the district court ordered that a desegregation plan be submitted. The order provided little guidance regarding the content of the plan to be prepared, merely requiring that it include the "six basic elements in successful school integration."[51] After plans had been submitted, the district court judge "criticized" them and then postponed imple-

under § 1292(a)(1), because it is presently operative and has not been modified by any subsequent order of the district court.

44. 557 F.2d at 381 & n.49.

45. *Id.* at 379–81.

46. 326 F.2d 616 (5th Cir.), *cert. denied,* 377 U.S. 924, 84 S.Ct. 1223, 12 L.Ed.2d 216 (1964).

47. *Frederick L. v. Thomas,* 557 F.2d 373, 380 (3d Cir. 1977). In *Braxton,* the district court enjoined certain practices, but deferred implementation of the order until "a plan to comply with these standards" had been submitted. *Id.* at 380.

48. *Board of Public Instruction v. Braxton,* 326 F.2d 616, 619 (5th Cir.), *cert. denied,* 377 U.S. 924, 84 S.Ct. 1223, 12 L.Ed.2d 216 (1964).

49. 375 F.2d 158 (10th Cir.), *cert. denied,* 387 U.S. 931, 87 S.Ct. 2054, 18 L.Ed.2d 993 (1967).

50. *Id.* at 164. In light of the specificity of the order regarding the content of the plan to be submitted, one issue raised on appeal was whether the district court could interfere with the supervisory functions of the board of education. *Id.* at 165.

51. 497 F.2d at 1029.

mentation of his desegregation order for one year so that there would be sufficient time in which to frame appropriate relief. The court of appeals in an opinion by Judge Friendly held that it did not have jurisdiction, "since the judge had neither entered a final judgment nor issued an injunction." In so holding, the court reiterated its ruling in *Taylor v. Board of Education* :

> We there held that when a district court has simply found segregation by a school board to be unconstitutional and has directed the board promptly to submit a plan for ending it, without any "injunction" other than the direction to file the plan, the decision is not appealable at that time.[52]

*Frederick L.* did not diverge from the instruction which Judge Adams discerned in the case law of other circuits. The portion of the *Frederick L.* order requiring the identification of learning disabled children was held to be appealable under 28 U.S.C. § 1292(a)(1) (1976), because whatever remedial order was ultimately entered, it could not affect the extent or nature to which learning disabled children were identified. The district court had "clearly ordered that all learning disabled children be identified," and only the mode for accomplishing that concrete result remained at issue.[53] Therefore, as Judge Adams pointed out, deferring review of that issue would not alter the appellate perspective. On the other hand, the court declined to hear the appeal from those portions of the order which required the submission of a plan for the placement of all learning disabled children and which denied the school district's request for an order compelling state financial assistance. Jurisdiction was lacking as to those issues, because "the scope and content of the educational plan that the district court approves may very well alter our perspective and could change the legal issues that are presented." [54]

The construction given to 28 U.S.C. § 1292(a)(1) (1976) in *Frederick L.* is grounded on a well-reasoned elaboration of the policies which underlie that statute. In a case in which the district court has, in its order, determined the nature and extent of the injunctive relief which the final decree will grant, all that remains for the parties is to propose the mechanics for the implementation of that relief. The issues in such a case are ready for appellate consideration, because the precise plan which ultimately will be adopted by the district court will do no more than determine *how* the injunctive relief will be accomplished as contrasted with the *nature* and *extent* of that relief.[55] Therefore, any actions that may thereafter be taken by the district court will not change or affect the legal issues raised by the appeal. In the case now before us, the order entered on May 15, 1973 did not determine the nature, requirements, scope or extent of the relief which the final decree will embody. The guidelines supplied by the district court for the defendants to follow in preparing the plan were mere generalities. Aside from the requirement that the plan alter the boundaries of General Braddock School District, the May 15, 1973 order is no different and no more specific than the order in *Taylor v. Board of Education.* Judge Adams distinguished the order in *Taylor* from those orders which are appealable as of right under § 1292(a)(1) by saying:

> *Taylor*, in our view, is not at odds with our decision. Unlike the situation in that case, delaying the day for appellate review here will not clarify the questions on appeal. In *Taylor* the exact desegregation plans offered by the school board and ultimately to be adopted by the school district had the potential to alter in a material manner the issues that would be presented to the court of appeals. The determination that desegregation was necessary and that a remedial plan must

**52.** *Id.* at 1030.

**53.** 557 F.2d at 381.

**54.** *Id.* at 381 n.49.

**55.** *Id.* at 381.

be submitted provided only a skeletal outline for later adjudication.[56]

Under *Frederick L. v. Thomas*, the order of May 15, 1973 cannot be regarded as an injunction which would support appellate jurisdiction under 28 U.S.C. § 1292(a)(1) (1976). Rather, it is merely a step in a judicial proceeding leading to the formulation of such relief. Important issues regarding the nature and extent of the relief to be afforded the plaintiffs still remained to be resolved and were dependent on the particular circumstances of the case as it was to develop in the proceedings subsequent to the entry of that order. Hence, an appeal from the May 15, 1973 order could not vest jurisdiction in a reviewing court because the "appellate perspective" remained subject to alteration until the particulars of the remedy had been formulated. Having concluded that the May 15, 1973 order was not an injunction, it is clear that appellate jurisdiction cannot be predicated upon the November 18, 1977 order as a "modification" of an injunction.

Even if we concluded otherwise and held that the May 15, 1973 order was an injunction, it is not evident to us in what respects it has been modified by the district court's November 18, 1977 order—the order from which this appeal has been taken. That order does not specify the nature and scope of the desegregation remedy. Rather, it continues to look toward the future formulation of a decree which will afford the plaintiffs the relief to which they are entitled under the district court's original order. The November, 1977 order differs in but one respect from the previous orders entered in this case. Whereas the prior orders required the defendants to prepare a plan, the November, 1977 order invites "any party" to submit a plan. Even if it might be argued that the May 15, 1973 order constituted an injunction which, if modified, would support appellate jurisdiction, the fact remains that the defendants discharged their obligation when they submitted Plan A in September, 1975. Thus, having complied with the May 15, 1973 order, there was no longer any continuing obligation on the defendants which could be modified. Whether the court in its November 18, 1977 order should have imposed a new obligation on the defendants to prepare a plan is a matter pertaining to the merits of this appeal rather than a matter concerning the presence or absence of a modification of the earlier order.

Having concluded that the November 18, 1977 order is not appealable, we have no jurisdiction to review it and thus must dismiss the plaintiffs' appeal. We are confident that, in light of the long history of this litigation and the sensitive, constitutional nature of the relief sought, the district court will require submission of a plan forthwith and certainly within the time limits of its original order,[57] will expedite all further proceedings, and will give priority on its calendar to consideration and implementation of the plan. This being so, it would appear that an appropriate final order can be entered by year end which will grant plaintiffs the relief to which they are entitled under the district court's order of May 15, 1973.

The appeal will be dismissed.

GIBBONS, Circuit Judge, dissenting:

Ten years ago the Pennsylvania legislature enacted legislation[1] which authorized county school boards to prepare, and the State Board of Education to approve, the reorganization and consolidation of school districts. Acting pursuant to that authority the Allegheny County school board prepar-

---

**56.** *Id.* at 380–81. Judge Adams distinguished the order found to be appealable in *Frederick L.* from the typical order to formulate a plan in a desegregation case: "Identification, unlike desegregation, knows no degrees." *Id.* at 381.

**57.** The order of May 15, 1973 provided for submission of a plan within forty-five days. Inasmuch as the plaintiffs now regard the Commonwealth's Plan A as affording appropriate relief, a common base apparently exists from which a remedy may be expeditiously fashioned.

**1.** Pub.L. 299, No. 150, Pa.Stat.Ann. tit. 24, § 2400.1 et seq. (Purdon Supp.1978), ("Act 150").

ed, and the Pennsylvania State Board of Education approved, the reorganization which brought the General Braddock School District into being on July 1, 1971. On June 9, 1971, before the General Braddock School District ever came into existence, several parents brought an action under 42 U.S.C. § 1983 charging that statutory reorganization had created a segregated school system in which General Braddock School District was identifiably black and the surrounding districts were identifiably white. The complaint sought relief on behalf of named children of the plaintiff parents. It also sought class relief. On March 21, 1972, the district court permitted the lawsuit to proceed as a class action. On May 15, 1973, after an extensive trial, the district judge determined that the charge of intentional discrimination in the creation of the General Braddock School District had been proved, and ordered the prompt submission of proposals for interdistrict relief.

Today, seven years after suit was brought, and five years after the finding of de jure segregation, no remedy has been adopted. The majority opinion deals adequately with the doleful procedural posture of the case. Thus there is no need further to rehearse its history. The order appealed from, which effectively made an about face on the approach to a remedy for de jure segregation which the court had earlier proposed, was justified on five grounds: (i) a lack of evidence of broad based support for a plan of desegregation in the General Braddock community; (ii) failure of that community to propose any plan; (iii) the effect on non-white children of substantial busing to communities in which they would be identified as outsiders and would be unwelcome and a financial burden; (iv) the traffic problems involved in busing; and (v) loss of community control by the General Braddock community. In addition, the lower court proposed, under the imagined compulsion of *Milliken v. Bradley*, 418 U.S. 717, 94 S.Ct. 3112, 41 L.Ed.2d 1069 (1974), to reopen the issue of whether school districts not created by Act 150 were active participants in the acts of deliberate discrimination charged in the complaint.

The majority, while it recites the procedural odyssey which produced the present state of inactivity, addresses none of these justifications for the lower court's order because it holds that we lack appellate jurisdiction. I conclude that we have appellate jurisdiction. Because none of the reasons relied upon by the district court justify its extraordinary change of position, I would reverse the judgment appealed from.

An order which has the effect of denying all relief for a violation of a constitutional right is a final decision within the meaning of 28 U.S.C. § 1291. It is critical, therefore, to examine not only the verbal formula in the order appealed from, but the necessary effect of that order. Thus to some extent the finality and the propriety of the order are interrelated.

The first reason advanced by the district court for its about face on an interdistrict remedy is the absence of "broad based community support for such a remedy." I would have thought that reliance upon community resistance to desegregation as a valid reason for denial of equitable relief was foreclosed as early as *Cooper v. Aaron*, 358 U.S. 1, 78 S.Ct. 1401, 3 L.Ed.2d 5 (1958). It is the district court's obligation to order an effective solution for de jure segregation. *Green v. County School Board*, 391 U.S. 430, 439, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968). Community resistance, even when manifested by white flight from a school system, cannot justify a less than effective solution. *Monroe v. Board of Commissioners*, 391 U.S. 450, 459, 88 S.Ct. 1700, 20 L.Ed.2d 733 (1968). The district court found community resistance to an effective remedy six years after the suit commenced. That resistance is unlikely to diminish six or sixty years hence. If community resistance is recognized as a valid reason for denying interdistrict relief, it can serve as a reason for denying such relief in perpetuity.

The district court also relied upon the failure of the affected community to propose a plan. The effect of this ruling, when combined with the court's failure to order the state authorities to submit a new plan,

was to shift the burden of preparing a remedy for de jure segregation from the defendants, who were responsible for creation of the segregated district, and who have the technical and financial resources to remedy the violation, to the victims, who lack those resources.[2] It is settled law that when intentional segregation has been found the responsibility for preparation of a remedial plan rests upon the school authorities and the district court, *not* upon the victims. *E. g., Evans v. Buchanan (II),* 582 F.2d 750, (3d Cir. 1978). Given the difficulty of preparing a satisfactory plan without the resources or expertise required to do so, the district court's contrary ruling creates a substantial risk that the lawsuit will be relegated to a permanent deep freeze.

The third consideration relied upon by the district court was the fact that non-white children would be bused to communities where they would be unwelcome and a financial burden. That reasoning is simply a refinement of the court's erroneous assumption that resistance to desegregation is a legally valid reason for the perpetuation of de jure segregation. No doubt there is unfortunate sentiment in the affected communities against busing black children to identifiably white schools and white children to identifiably black schools. Provisions in a plan designed to protect against adverse consequences of such sentiment are obviously appropriate. But to rely upon those feelings as a reason for denying relief legitimates them by suggesting that they are a permissible justification for governmental (in this instance judicial) inaction. So legitimated community sentiment stands as a perpetual barrier to the implementation of an effective remedy for de jure segregation. And insofar as tacit judicial acceptance of community opposition rein-

forces that opposition the barrier of community sentiment may well be higher hereafter than when the court first denied relief.[3]

In addition, the district court counted against the plan the fact that for General Braddock District it would have resulted in diminished control over its own schools. But that control exists only because of the alleged violation of the Fourteenth Amendment. If the passage of time has given the community a vested interest in control of the illegal district, each year that passes obviously will strengthen that interest, raising ever higher the bar to an effective remedy. Surely the district court's reliance upon this factor was impermissible.

Finally, the district court expressed its belief that *Milliken v. Bradley,* 418 U.S. 717, 94 S.Ct. 3112, 41 L.Ed.2d 1069 (1974) (*Milliken I*) "raises doubts about the application of an interdistrict remedy to districts that have not been full participants in all proceedings." The court concluded, further, that the same districts must, under *Milliken,* be excluded from the remedy unless there is evidence of a deliberate, purposeful, segregative intent in their creation. Plainly this was a misreading of *Milliken I.* The limitations upon the equitable remedial powers of the federal courts outlined in that case clearly permit decrees reaching both districts which have committed acts of de jure discrimination, and districts in which significant segregative effects have occurred as a result of discriminatory acts committed elsewhere. *Milliken v. Bradley,* 418 U.S. at 744–45, 94 S.Ct. at 3127; *accord, Hills v. Gautreaux,* 425 U.S. 284, 293–94, 96 S.Ct. 1538, 47 L.Ed.2d 792 (1976). Moreover, *Milliken* reserved the question whether districts affected by a remedy must par-

**2.** On December 23, 1974 the plaintiffs moved for the appointment of a consultant to prepare a plan for the court. To date no action has been taken on that ruling.

**3.** Studies of plan acceptability conducted in 1974 and submitted to the district court suggest that public opposition will be the inevitable concomitant of any effective desegregation plan. According to the study, every plan proposed (except the "free choice" tuition plan,

which was unacceptable for other reasons) faced substantial public opposition either in the surrounding communities or in General Braddock District. (App. at 350–352a). It is unlikely that this situation has changed since that time. Hence, it could be argued that the district court's consensus requirement amounted to a holding that no relief would be allowed at all.

ticipate in litigation over the violation. 418 U.S. at 752–53, 94 S.Ct. 3112. This court in our prior opinion rejected the claim of potentially affected districts to be granted general intervention. *Hoots v. Commonwealth of Pennsylvania,* 495 F.2d 1095 (3d Cir.), *cert. denied,* 419 U.S. 884, 95 S.Ct. 150, 42 L.Ed.2d 124 (1974). In *Evans v. Buchanan, supra,* this court reviewed an interdistrict remedy in a case in which the affected districts did not participate in litigation of the alleged violation, although they had properly been allowed to intervene to present evidence bearing on the extent to which they had been affected by the violation. *See Evans v. Buchanan,* 393 F.Supp. 428, 431 (D. Del.), *aff'd,* 423 U.S. 963, 96 S.Ct. 381, 46 L.Ed.2d 293 (1975). The district court's patent misapplication of *Milliken I* has the effect of starting this seven year old case all over again at the stage of litigation over violation, prolonging, perhaps for years, the denial of an effective remedy.

For me, this review of the effect of the lower court's order clearly indicates that it is appealable. The immediately relevant precedent is *Kelley v. Metropolitan County Board of Education,* 436 F.2d 856 (6th Cir. 1970), which held that a district court order entered in August, 1970, staying all proceedings on proposed desegregation remedies for the Nashville school system in order to await the Supreme Court's decisions in the 1971 school desegregation cases,[4] was final under 28 U.S.C. § 1291. The majority appears to agree that the result in *Kelley* was sound. However, it finds that *Kelley* is distinguishable on two grounds. First, it is claimed that the order appealed from, unlike the order in *Kelley,* "interposes no bar to further proposals for relief." Second, the majority argues that the order, by its terms, does not require that there be any more delay than may be necessary for the parties to formulate a plan.[5]

Whether one looks to the facts of *Kelley* or to its underlying rationale, the majority's reasoning inadequately confronts the force of that opinion. It is highly formalistic to argue that the order entered here poses "no bar" to attainment of ultimate relief in this case. The effect of the order, as outlined above, is to place substantial, probably insuperable, obstacles in the way of the formulation of an effective decree. First, by rejecting the State defendants' Plan A and the other plans submitted by local districts the order eliminates from consideration most if not all alternatives which might have been resorted to in order to remedy the interdistrict violation which has been found. Second, the trial court has relieved the state and county defendants, who committed the violation, and who alone have the financial resources and technical skills to devise a remedy, of the burden of doing so. While this order does not forbid the defendants from submitting new plans, it has shifted the task of formulating a plan to the plaintiffs, who lack the resources to do so. Third, the order places upon the plaintiffs the responsibility for generating community support, presumably both in and outside of the General Braddock district, for any plan they propose—a burden that is plainly illegal and which, based on the record before us, has thus far been beyond the capacity of even a well financed state agency to meet. Moreover, as each day passes the district court's demand for a consensus plan becomes increasingly difficult to satisfy, since so long as white flight from the General Braddock district[6] (which has in all probability been accelerated by the original segregation decision) continues, the mutual suspicion and mistrust between General Braddock and surrounding white districts can only increase. In my view, the order, as a practical matter, interposes a substantial "bar to further proposals for relief."

---

**4.** *E. g., Swann v. Board of Education,* 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971).

**5.** The majority also implies that the fact that *Kelley* had been pending for 15 years distinguishes the two cases. Majority Opinion, *su-*

*pra,* at 1347 n.34. For the reasons set out, *infra,* at n.7, I find this argument wholly unpersuasive.

**6.** *See, e. g., Hoots v. Commonwealth of Pennsylvania,* 359 F.Supp. 807, 814–15 (1973).

Second, while the order does not "by its terms" require that there be any more delay than may be necessary for the parties to formulate a plan, the prior history of this litigation indicates that even if the plaintiffs were able quickly to prepare and present a new plan, they could not expect a decision on the merits in less than two years. In view of the severe requirements which the court's order imposed upon the plaintiffs, and the need, under the district court's mistaken view of the case, for a partial relitigation of the merits, it is not at all likely that any new plan of relief will be rapidly formulated. Thus, assuming optimistically that plaintiffs could indeed formulate any plan meeting the standards of the lower court, the likelihood that such a plan would be implemented before the tenth anniversary of this action's commencement, is, absent timely appellate intervention, remote. This two to three year delay contrasts sharply with the nine or ten month stay contemplated by the district court in *Kelley*.[7]

On the facts, then, this appeal presents a stronger case for a finding of finality than did the appeal in *Kelley*. More important, the majority's argument against appealability wholly ignores the core of the *Kelley* opinion. As Judge Edwards wrote:

It is clear to us that the rights of school children to schooling under nondiscriminatory and constitutional conditions cannot be recaptured for any school semester lived under discrimination [sic] practices. Nor can any court thereafter devise an

effective remedial measure. Therefore, we have no doubt that the District Court order of August 25, 1970, staying pupil integration proceedings for an indefinite time was final and appealable under 28 U.S.C. § 1291.

436 F.2d at 862. Precisely the same type of continuing, irremediable injury that served to justify the finding of finality in *Kelley* is present in this case. With the passage of each year, another class graduates from a segregated school system and is forever deprived of effective relief. For example, of the sixteen named student plaintiffs in this case, nine have already graduated from a segregated school system.[8] Five others will graduate by 1981,[9] the year which, in light of the prior history of this case, we may view as a likely date for any new desegregation proposal. Eric Smith and Byron Knight, who were respectively in first grade and kindergarten in 1971, may, if they are lucky, see the implementation of some decree before they graduate from high school. Without appellate relief, the children of the students who graduated with the General Braddock School District's first class in 1972 are likely to be attending segregated kindergartens in that district before any steps are taken to remedy the violation of law to which their parents were subjected.

Obviously the time demands of complex litigation make some delay in the provision of federal desegregation remedies inevitable, and the non-reviewability of most inter-

7. The delay contemplated here is not more excusable than that in *Kelley* because this case has "only" been pending for seven years. *Kelley* involved the desegregation of a district with 95,000 students and a long history of racial segregation. 436 F.2d at 859 n.4. While precise comparisons are not possible, the case here involves a total student population much smaller than that involved in *Kelley*, and there is, of course, no history prior to 1971 of deliberate segregation. Furthermore, in *Kelley*, once the actual constitutional violation had been adjudicated, the remedy followed within two years. *See Kelley v. Metropolitan County Bd. of Educ.*, 463 F.2d 732 (6th Cir.), *cert. denied*, 409 U.S. 1001, 93 S.Ct. 322, 34 L.Ed.2d 262 (1972). That delay is dwarfed by the probable seven or eight year delay of remedy that could

result from the holding of non-appealability in this case.

8. In 1971, Ronald Knight was an eleventh grader. Loretta Knight was in tenth grade. Terrence Knight, Janelle Hoots and Tawanda Smith were all in ninth grade. Pamela Knight, Tevela Smith, and Joseph Smith were in seventh grade, and Lucinda Smith was a sixth grader. (App. at 17a–18a). Assuming that they were promoted in due course, all of these students have now graduated from high school.

9. Darryl Knight (fifth grade); Robert Smith (fourth grade); Jamie Hoots, Marc Knight, and Wesley Smith (second grade). (App. at 17a–18a).

locutory orders must be accepted as a necessary concomitant of that delay.[10] But the lesson of *Kelley* is that when unconscionable delay threatens to work upon an entire generation of students a wholesale deprivation of constitutional rights,[11] further needless extensions of the proceedings need not be tolerated. Such a deprivation is threatened here. In this case, there is in addition, a substantial likelihood that the conditions imposed by the lower court's order will render impossible the formulation of an effective decree in any event—a factor not present in *Kelley* which also conduces strongly to a finding of finality.[12]

Read in this fashion, *Kelley* is consistent with the decisions of this court. Although this circuit has traditionally adopted a restrictive approach to finality, it has nevertheless allowed review of otherwise interlocutory orders where postponing review would effectively prevent vindication of an interest protected by federal law. In *United States v. DiSilvio*, 520 F.2d 247 (3d Cir.), *cert. denied*, 423 U.S. 1015, 96 S.Ct. 447, 46 L.Ed.2d 386 (1975), we held that a defendant in a criminal case could appeal from an order denying a motion to dismiss an indictment on double jeopardy grounds, because postponing review until after trial had the effect of destroying at least part of the substance of the constitutional rights being asserted. That approach to finality was approved in *Abney v. United States*, 431 U.S. 651, 97 S.Ct. 2034, 52 L.Ed.2d 651 (1977). *Accord, United States v. Venable*, No. 78–1224 (3d Cir. Sept. 22, 1978); *United States v. Inmon*, 568 F.2d 326 (3d Cir. 1977).

In this case, for many class members, further delay threatens to destroy the entire right being asserted. It is no answer that in the dim and distant future other class members, perhaps still unborn, will be able to bring before us similar claims. There is no way that those plaintiffs can vindicate in any practical way the interests of litigants adversely affected by the district court order.

Similarly, when the interests of the federal government as a prosecutor are affected by a stay we have not hesitated to take a flexible approach to finality. In *In re Grand Jury Proceedings*, 525 F.2d 151 (3d Cir. 1975), the district court had stayed a federal grand jury investigation of criminal violations of the Clean Air Act in the steel industry pending the resolution of a parallel state court contempt proceeding involving the same alleged violations. This court held that the stay, though interlocutory, could be reviewed under § 1291 because the term of the grand jury might expire before the state court proceedings concluded, the statute of limitations continued to run, and violations of federal environmental statutes continued daily. Here the effect of the order appealed from, like the order held final in *In re Grand July Proceedings*, is to hamstring the effective vindication of federal interests. Like the statutory violations which evaded prosecution because of the running of the statute of limitations, the constitutional violations in this case cannot be remedied by later review. It is therefore difficult for me to perceive any princi-

10. This, I take it, is the thrust of the majority's assertion that " 'the mere prospect of delay' may not create appellate jurisdiction." Majority Opinion, *supra*, at 1347.

11. *Cf. Cox Broadcasting Corp. v. Cohn*, 420 U.S. 469, 95 S.Ct. 1029, 43 L.Ed.2d 328 (1975), where Justice White listed as one of four exceptions to the rule of strict finality

   situations where the federal claim has been finally decided, with further proceedings on the merits . . . to come, but in which later review of the federal issues cannot be had, whatever the ultimate outcome of the case.

   420 U.S. at 481, 95 S.Ct. at 1039. For the students who have graduated from the General

Braddock District, the federal claim that was first raised in 1971 can no longer be reviewed, regardless of the outcome of this case.

12. The majority suggests that it might in some other more compelling desegregation case be prepared to hold that an otherwise interlocutory order was a final denial of relief. Majority Opinion, *supra*, at 1346. *Cf. Hart v. Community School Bd.*, 497 F.2d 1027, 1031 (2d Cir. 1974) (stating that "there may be circumstances where failure to order a desegregation long overdue constitutes a denial of an injunction even though those formal words were not uttered"). They do not, however, satisfactorily explain why this appeal does not present the proper occasion for such a holding.

pled distinction between the posture in which the federal government found itself in *In re Grand Jury Proceedings*, and the plight of numerous class members in the instant case.

Three reasons usually are advanced for our resistance to entertaining appeals before the end of the entire case. The first is that interlocutory appeals often bring the legal issues to us in a posture in which they cannot be dealt with intelligibly. The second is that allowing interlocutory appeals produces delay. The third is our preoccupation with appellate caseloads. These reasons do not justify the dismissal of the instant appeal. I have found no difficulty in discussing, dissecting, and rejecting every reason relied upon by the district court in support of the order appealed from. On the record before us, where the very object of the appeal is to cure unconscionable delay which is causing irreparable harm, the majority's reference to "the goal of speedy justice" as a justification for dismissing it rings hollow. And as to caseload considerations, this is one of those cases in which our concern about the caseload must yield to our obligation to enforce the supremacy of federal law. There is no justification for dismissing this appeal.[13]

## CONCLUSION

As early as 1848 the Supreme Court stated that the statutory requirement of finality, when applied to cases seeking equitable relief, should not be read "in [a] strict and technical sense, but [must be] given . . . a more liberal, and as we think, a more reasonable construction, and one more consonant to the intention of the legislature." *Forgay v. Conrad*, 47 U.S. (6 How.) 201, 203, 12 L.Ed. 404 (1848). Chief Justice Taney recognized that when an interlocutory decree required the delivery of land and slaves from one party to another, the party deprived of their use and services was subjected to irreparable injury.

> For the lands and slaves which they claim will be taken out of their possession and sold, and the proceeds distributed among the creditors of the bankrupt, before they can have an opportunity of being heard in court in defence of their rights. We think, upon sound principles of construction, as well as upon the authority of the cases referred to, that such is not the meaning of the acts of Congress.

*Id.* at 204. It is a nice irony that the final judgment rule could be construed to accommodate the interest of a master in the continued possession of his slave, but cannot, according to the majority, be construed to prevent the permanent loss to the class members in this case of the right to an education in a nonsegregated school.

I would vacate the judgment of the district court and would remand to the district court with directions to proceed forthwith with the selection and implementation of an interdistrict remedy submitted by the defendants. Given the majority's position in this appeal, I can only suggest that if plaintiffs' future efforts to obtain from the district court an order meeting our rigid tests for appealability prove ineffective, they should consider resort to our mandamus jurisdiction.

---

**13.** Since the order appealed from is final, and thus appealable under § 1291, it is unnecessary to join issue with the majority over its rejection of appellant's alternative contention that the effect of the order was to modify an injunction. *See* 28 U.S.C. § 1292(a)(1).